**In re Dennis Jude WALSH, Debtor.**

**Timothy and Pamela TAUBERT, Plaintiffs,**

**v.**

**Dennis Jude WALSH, Defendant.**

**Bankruptcy B90–14705.**
**Adv. No. B91–1050.**

United States Bankruptcy Court, N.D. Ohio, E.D.

Aug. 10, 1992.

Jonathan P. Blakely, Paul Newman, Chardon, Ohio, for plaintiffs.

Harlan Stone Hertz, Cleveland, Ohio, for defendant.

## MEMORANDUM OF OPINION AND DECISION

WILLIAM J. O'NEILL, Bankruptcy Judge.

Before the Court is the complaint to determine dischargeability pursuant to 11 U.S.C. § 523(a)(6) filed by Timothy and Pamela Taubert and the answer of Defendant–Debtor, Dennis Jude Walsh. This is a core proceeding within the jurisdiction of the Court. 28 U.S.C. §§ 1334, 157(a), (b)(2)(I), General Order No. 84 entered July 16, 1984 by the United States District Court for the Northern District of Ohio.

Plaintiffs' motion for summary judgment on the within complaint was denied by order of February 25, 1992. This Court ruled the dischargeability issue must be determined by the bankruptcy court, but held Plaintiffs' state court judgment for $149,-

930.99 plus interest and costs is binding as to amount and validity in Plaintiffs' claim filed herein. The dischargeability issue proceeded to trial. On consideration of the evidence presented relevant facts are as follows:—

Debtor, Walsh, is thirty-five years old and has been involved in the construction business for at least 15 years. (T. 89–90, 139–142). He was president of The Walsh Company, a corporation engaged as general contractor in construction of homes. (T. 89–90). He was president from 1985 to 1989, during which time he financed construction of 40 to 50 homes through Security Federal Savings & Loan (Security). (T. 90). In May of 1989, The Walsh Company entered into a written agreement with the Tauberts for construction of a new home. (Exh. 4).

The Tauberts contracted with The Walsh Company because of its reputation as a good builder. (T. 118–120). They had previously purchased the lot on which the house was to be constructed. (Exh. 1, 2; T. 118). When the parties signed the agreement the Tauberts asked Debtor if he was financially sound and were so assured. (T. 120, 224, 262). The parties' agreement for the construction of a home was priced at $188,000.00. Tauberts paid $1,800.00 in earnest money with an $18,800.00 downpayment. (Exh. 3, 9, 10; T. 118, 121–122). Pursuant to agreement they deeded their lot to The Walsh Co. which applied for and obtained the construction loan from Security. (Exh. 7). Evidence reflects the Tauberts inquired to obtain their own construction loan, but ultimately agreed The Walsh Company would carry the loan. (T. 120, 157, 263). Pursuant to the agreement they executed a waiver of priority which waived priority of any vendees' lien in favor of the construction loan mortgage. (Exh. 4, 12).

Debtor applied for and obtained a construction loan from Security. (Exh. 5, 6). The Bank was given an open-end mortgage on the property. (Exh. 11). The construction loan required compliance with Section 1311.011 of the Ohio Revised Code prior to any payment to The Walsh Co., the contractor. Debtor's extended relationship with the Bank dating back fifteen years resulted in lax procedures regarding loan applications. (T. 144–147). The Taubert job construction loan application is essentially blank containing only a description of the property and the name, address and identification number of The Walsh Company. (Exh. 5). No financial information is included. The Bank apparently requested financial information regarding Debtor and the corporation on an occasional basis. (T. 147–148).

Construction of the Taubert house commenced in the summer of 1989. During this period the Company was building a total of five houses. (T. 179). No rancor existed in the parties' business dealings. (T. 133, 159). The Company experienced financial difficulties from the spring of 1989 and had begun negotiations with Security to obtain additional funds. (T. 114, 188–192, 248). Debtor presented a business analysis to the Bank and proposed his personal residence as collateral. (T. 190–193). He previously obtained a line of credit in the spring of 1988. (T. 151). Debtor's practice was to use construction loan draws from various projects to pay business obligations without reference to whether obligations paid pertained to the specific project on which the draw was made. The Company operated successfully in this fashion for years. Draws were used to keep jobs going to enable the company to obtain materials and services of subcontractors necessary for job completion. Continued business activity and profits plus borrowed funds were expected to allow ultimate payment of the Company's outstanding debts. The intention was to pay for work and materials on the Taubert job but not necessarily with funds drawn on that construction loan. (T. 113–114, 149, 187–189, 195, 226–227, 239–242). Late in November of 1989 the Bank indicated it would not provide the expected financing. (T. 192). At that time construction on all current projects ceased on advice of Debtor's legal counsel. Debtor proposed placing his personal residence on the market and deeding it to a trust for the benefit of his customers. An appraisal indicated substantial equity; however, the house failed

to sell. (T. 110–111, 191–195, 218). The property Tauberts had transferred to The Walsh Company was deeded back to them in January of 1990. (Exh. 40; T. 116, 129). Various mechanics' liens were filed against it due to Debtor's failure to pay materialmen and subcontractors. (Exh. 41–47). These liens total $51,142.70.

Debtor, as president of The Walsh Company, made four draws on the Taubert project construction loan. His office manager prepared the documentation to obtain each draw consisting of an invoice containing the price for the designated work and a draw request form. (Exh. 13, 14, 20, 22, 30, 33, 35, 36; T. 52–61, 69–70, 97–98, 163–164, 235, 238–239). The draw request form was a single piece of paper containing printed material on both sides. One side provides an outline for an owner's request for a construction loan draw. The reverse side is an outline for an affidavit by an original contractor regarding payment for work performed and materials furnished on a particular project and is intended to comply with Section 1311.011(B)(4) of the Ohio Revised Code. The office manager prepared these forms by filling in the draw request information. Debtor signed that side of the form and the empty reverse side. The office manager took the draw request documentation to the Bank.

There was contradictory evidence concerning Debtor's signing of the affidavit side of the above discussed draw request form. Debtor and his office manager testified that pursuant to Bank's instructions the Debtor merely signed this form in blank and she delivered it. His oath was not taken and the forms were not notarized. (T. 97–100, 152, 160–161, 168–169, 208–215, 235–239, 242–247). Debtor indicated he knew what an affidavit was and knew bills remained unpaid on the Taubert project. (T. 100, 173, 188). A bank employee whose notarization appears on one of the affidavits testified to the contrary. (Exh. 20). She stated Debtor signed the affidavit in her presence at a bank branch office indicating it was his free act and deed. This testimony was not credible, however, because of her demeanor, selective memory and repeated inconsistencies.

(T. 13–39). Moreover, Exhibit 20, the affidavit she purportedly notarized, is incomplete. It fails to indicate the property involved or that it relates to the Taubert job. It appears, therefore, that the draw forms were prepared as Debtor testified; i.e. they were signed in blank by him and delivered to the Bank. The affidavits do not reflect any outstanding unpaid claims on the project, although amounts were unpaid when the draw requests were made. Bank employees subsequently notarized the forms.

After draw requests were submitted, the Bank had an inspector verify progress on completion of the house and funds were advanced accordingly. (T. 44, 69–70, 84, 175–176). In the spring of 1989 the Bank knew of Debtor's financial problems and that there were outstanding obligations on various company projects. Consequently, it requested additional documentation regarding its financing of construction not previously requested or required. (T. 32–33, 43, 50–52, 78–79, 81–82, 152–156, 166–167, 170–174, 183–187, 247). Specifically, it required Debtor to obtain lien waivers indicating payment to subcontractors and materialmen for ongoing jobs. (Exh. 15, 16, 19). Additionally, Bank required two multi-page documents entitled "Affidavit of Contractor." (Exh. 31, 34). Debtor signed these documents in blank in the Bank's main office at Bank's request. These documents refer to the Taubert property and indicate all subcontractors and materialmen are paid in full except as stated below, and no names of subcontractors or materialmen appear below. The documents are notarized by Bank employees. It is unclear who filled out the documents, but it is patently clear they were not completed by Debtor or his company. (T. 81–82, 102–105, 182–187, 212–214, 247).

The Tauberts sued Debtor, The Walsh Co. and Security in Geauga County Common Pleas Court for money damages and fraud. (Exh. B to Plaintiffs' Motion for Summary Judgment). They were granted default judgment against Debtor and The Walsh Company pursuant to a judgment entry dated August 31, 1990. (Exh. D to

Plaintiffs' Motion for Summary Judgment). The judgment provides as follows:—

"1) That defendant, Dennis Walsh, has intentionally, maliciously, and with reckless disregard of the rights of others, violated Ohio Rev.Code Sections 1701.93(A)(1) and (B) by making, signing and executing false affidavits respecting The Walsh Company business and liabilities, and,

2) That plaintiffs, Timothy and Pamela Taubert, are granted judgment in their favor against defendants, The Walsh Company and Dennis Walsh, jointly and severally, in the amount of $149,930.99, plus interest at the statutory rate from July 16, 1990, and,

3) Costs assessed against defendants, The Walsh Company and Dennis Walsh."

Debtor filed a petition under Chapter 7 of the United States Bankruptcy Code on October 9, 1990.

Plaintiffs request judgment pursuant to Section 523(a)(6) of the Bankruptcy Code which provides for non-dischargeability of debt:—

"for willful and malicious injury by the debtor to another entity or to the property of another entity;"

11 U.S.C. § 523(a)(6)

Plaintiffs assert their judgment which establishes the debt is within the scope of this section. Their standard of proof is a preponderance of the evidence. *Grogan v. Garner,* — U.S. —, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

■ A debt must be based on conduct which is both willful and malicious to be non-dischargeable under Section 523(a)(6). "Willful" indicates deliberate or intentional conduct which necessarily leads to injury. *Perkins v. Scharffe,* 817 F.2d 392 (6th Cir. 1987), cert. den. 484 U.S. 853, 108 S.Ct. 156, 98 L.Ed.2d 112 (1987). "Malicious" indicates conduct in conscious disregard of one's duties or without just cause or excuse, it does not require ill-will or specific intent to do harm. *Perkins, Wheeler v. Laudani,* 783 F.2d 610 (6th Cir.1986). The term malicious does not encompass reckless conduct. *Wheeler.* Therefore, a wrongful act done intentionally which nec-

essarily produces harm and is without just cause or excuse constitutes a willful and malicious injury. *Perkins, Vulcan Coals, Inc. v. Howard,* 946 F.2d 1226 (6th Cir. 1991).

■ Debtor's signing contractors' affidavits in blank which lacked amounts owed subcontractors and materialmen and using Taubert construction loan proceeds for general business expenses is asserted to be willful and malicious. Plaintiffs' injury was established by the state court judgment and by the mechanics' liens which encumber their property. Debtor's conduct was clearly intentional and deliberate. He followed an established practice of signing affidavits in blank and requesting and receiving construction loan draws with no intent to apply them specifically to the Taubert job. His actions, therefore, were willful within the terms of Section 523(a)(6). The issue is whether they were also malicious as that term has been defined.

■ It is alleged Debtor's conduct violated two Ohio statutory provisions, Sections 1311.011(B)(4) and 1701.93, in addition to provisions of the agreement with the Tauberts to construct their home and, therefore, is malicious. Section 1701.93 prohibits a corporate officer, director, employee or agent from making, with intent to deceive, any materially false statements or entries regarding, inter alia, a corporation's liabilities. Ohio Rev.Code Ann. § 1701.93 (Anderson, 1985). Section 1311.011(B)(4) prohibits a lending institution from making payments under a home construction loan to a contractor until the contractor provides an affidavit for payment of work, labor and materials. The lending institution may accept the affidavit and act in reliance thereon in making payments unless it appears fraudulent on its face pursuant to Section 1311.011(B)(5). Ohio Rev. Code Ann. §§ 1311.011(B)(4), (5) (Anderson, 1979). Section 1311.012 imposes penalties on a contractor for knowingly supplying a false affidavit. Ohio Rev.Code Ann. § 1311.012 (Anderson, 1979).

Debtor's conduct does not appear to violate the provisions of the above paragraph notwithstanding the state court's default

judgment under Section 1701.93. The evidence reflects Debtor signed the form affidavits in blank as the Bank instructed. As such, the documents did not constitute declarations under oath. See Ohio Rev.Code Ann. § 2319.02 (Anderson, 1991). Bank employees subsequently notarized the forms presented to the Bank to obtain loan draws. The Bank was aware of Debtor's financial condition and of outstanding obligations on various construction projects. Pursuant to statutory provisions cited, the affidavits were submitted to the bank to obtain loan draws. Clearly, Debtor's intent in submitting the forms was not to deceive or knowingly provide false information to the Bank. The intent was to comply with Bank procedure for obtaining loan draws to complete ongoing projects. Moreover, while this conduct ultimately resulted in non-compliance with provisions of the Taubert agreement, it was not so intended. While Debtor's conduct of submitting affidavits may have been reckless, it obviously was not malicious.

Debtor's course of conduct with the Tauberts had proven successful with numerous other construction projects. He obtained construction loan draws which were used to maintain his business. There is no evidence he diverted or used funds for purposes other than maintaining the business. He bore no ill-will or animus toward the Tauberts and fully intended to complete their home and pay the attendant project costs from working capital, profits and borrowings. Moreover, he apparently pursued this course of conduct with Security Federal's knowledge and acquiescence. He neither intended nor foresaw harm to the Tauberts, and his conduct was not "without just cause or excuse" and, therefore, was not malicious within the meaning of Section 523(a)(6).

## CONCLUSION

The debt in issue is dischargeable pursuant to 11 U.S.C. § 523(a)(6).